IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

DAVID LESTER DOMBROCK,

                  Plaintiff,                    OPINION AND ORDER

    v.

                                              18-cv-686-wmc

ANDREW SAUL,
Acting Commissioner of Social Security,

                  Defendant.

This is an action for judicial review of the adverse portion of a partially favorable decision of the Commissioner of Social Security, which affirmed an administrative law judge's ("ALJ") decision to award disability benefits to plaintiff David Dombrock for the period August 3, 2014, through November 17, 2016, but to deny benefits from November 18, 2016, onwards based on a finding of medical improvement. Because the court agrees that the evidence of record fails to support a finding of medical improvement, the unfavorable portion of the Commissioner's decision will be reversed, and the case will be remanded to the agency for further proceedings.

## FACTS

### A. Background

Plaintiff is a 54-year-old, former ski tow operator and maintenance worker with limited, formal education, having dropped out of school after ninth grade. After suffering a stroke on August 3, 2014, he applied for disability insurance benefits and supplemental security income on August 27, 2014, alleging that he was unable to work because of the stroke, illiteracy, right ankle injury, right fractured heel, memory loss, high blood pressure, and heart problems.

The agency denied his claims initially on February 10 and on reconsideration on June 4, 2015. Plaintiff then requested a hearing, which was held before ALJ Kathleen Kadlec on March 29, 2017. ALJ Kadlec heard testimony from plaintiff and a vocational expert. On June 28, 2017, ALJ Kadlec issued a partially favorable decision, awarding plaintiff benefits for the period August 3, 2014, through November 17, 2016. However, she denied his claim for benefits from November 18, 2016, onwards, finding that his medical condition improved sufficiently by that date to no longer be considered disabled. The Appeals Council subsequently denied plaintiff's request for review.

### B. Medical Overview

#### 1. 2013-2015

About a year before his stroke, on September 6, 2013, plaintiff fractured his right heel bone when he fell from a ladder at work. By April 1, 2014, he told his physician, Danielle Redburn, DPM, that he was back to wearing normal shoes, had returned to work with restrictions, and was doing well. On examination, Dr. Redburn found normal strength in the foot and ankle and only mild tenderness with range of motion. She released him to work without restrictions, but discussed with him the "need to treat residual subtalar joint arthritis [status post] calcaneal fracture." (AR 304.)

Three months later, on July 10, 2014, plaintiff returned to see Dr. Redburn, reporting significant pain and chronic swelling on the right side of his right foot that was keeping him from performing his typical activities, such as mowing the lawn, running, or walking on uneven surfaces. Plaintiff was not working at that time, having been laid off from his seasonal job at the ski hill since April. On exam, plaintiff had limited range of

motion and pain in the subtalar joint and focal pain over the sinus tarsi.[1]  Dr. Redburn diagnosed sinus tarsi syndrome and subtalar joint osteoarthritis, which she treated by injecting the right ankle joint.  She also prescribed Ultram (a narcotic-like medication used to treat moderate to severe pain) and advised plaintiff to wear supportive shoes and avoid uneven surfaces.  (AR 305.)

On August 3, 2014, plaintiff reported to the St. Croix Falls Emergency Department with sudden right-sided weakness and a CT scan of his brain showed that he had suffered a stroke.  (AR 310.)  Admitted to the hospital that same day, the plaintiff received physical and occupational therapy for right-sided weakness, impaired coordination and sensation on the right side, and impaired gait.  (AR 312-324; 326-340.)  By August 6, his strength and coordination in his right upper extremity and gait had all improved significantly, such that he was able to go home with a referral to outpatient physical and occupational therapy.  (AR 343.)  He was also prescribed medications to lower his blood pressure and cholesterol, referred to cardiology for evaluation, advised to quit smoking, and scheduled for a neurology follow-up in one month.  (AR 340-345.)

On August 12, 2014, plaintiff told occupational therapist Melinda Grandaw that he had trouble releasing objects once he had gripped them, and could not open a jar, carry groceries, or pour coffee with his right hand.  He also struggled with getting dressed but could do so without assistance, and bending over caused lightheadedness.  Further, plaintiff reported having trouble sleeping because his right elbow flexed involuntarily and his lower right scapula hurt.  Finally, plaintiff reported intermittent numbness and tingling in his

---

[1]The sinus tarsi is a tunnel between the ankle and heel bones that contains structures that contribute to ankle stability.  *See* https://www.physio-pedia.com/Sinus_Tarsi_Syndrome.

3

right forearm continuing into his right fingertips. In addition, Grandaw observed that plaintiff avoided moving his right arm above shoulder height, lacked coordination with right upper extremity reaching and placement of objects, and had trouble releasing objects from his grasp. Grandaw then showed plaintiff some exercises he could do to increase his motion in his shoulder and reduce the spasticity in his right biceps. (AR 351-55.)

Plaintiff continued to receive regular physical and occupational therapy for the next several weeks. On August 20, 2014, plaintiff reported that his primary care physician had recently prescribed Gabapentin for his right scapula and rib pain and that it was helping. (AR 364.) By August 29, plaintiff had increased his right hand grip strength by 20 pounds (from 26.67 to 46.67 pounds) and had better coordination with his right hand. (AR 376.) However, he was now having pain in his right ring finger when doing grasping activities, and he still woke during the night with pain and spasticity in his right biceps and forearm. (Id., 378.) He also reported continued dizziness and nausea with positional changes, walking down steps, or turning his head to the side. (AR 378.)

Plaintiff saw neurologist Dr. Gurdesh Bedi in follow up on September 9, 2014. Motor testing of plaintiff's right upper extremity showed 3/5 to 4-/5 strength in the deltoid, 4-/5 strength in the biceps and triceps, and 3/5 strength in the long finger flexors. In the lower extremity, strength testing was generally 4/5. Dr. Bedi noted that plaintiff had improved strength since his hospital discharge but still had some continued weakness and spasticity on the right side. (AR 382.)

On September 11, 2014, a loop recorder was implanted in plaintiff's chest to monitor for irregular heart rhythms. (AR 383.) Separately, on September 15, cardiologist Marco Guerrero, M.D., noted that plaintiff had left ventricle noncompaction, which could

4

have caused his stroke. At Dr. Guerrero's recommendation, plaintiff agreed to begin taking warfarin, an anti-coagulation drug. (AR 384.)

On November 3, 2014, plaintiff told Grandaw, his now, ongoing occupational therapist, that he tired easily with minimal activity, needing to stop and rest when walking a half block to the store. However, when Grandaw asked him to walk as far as he could without stopping in the therapy room, he was able to walk the equivalent of at least two blocks. Plaintiff also continued to have right shoulder and rib pain when he raised his right arm, prompting Grandaw to opine that his right shoulder/neck symptoms appeared to be at maximum medical improvement. Still, Grandaw thought plaintiff ought to be able to return to work at the ski slope pushing the button to operate the tow rope, provided he did not develop more dizziness episodes, which continued to be of concern. Plaintiff was to continue with "work hardening" at therapy for the next two weeks before being discharged and to continue his exercise program at home. However, he did not return for his last two occupational therapy visits. In her discharge summary, Grandaw noted that when last measured in September, plaintiff had 50-pound grip strength on the right and significant right hand fine motor coordination deficits. (AR 465-466; 469.)

During a follow up visit, on November 12, 2014, plaintiff saw Dr. Bedi in. On examination, plaintiff had marginal weakness on the right side, with 4/5 strength in the deltoids, biceps and triceps, grip strength about 4-/5 as compared to the left, and right lower extremity strength between 4 and 4+/5. Plaintiff reported ongoing numbness and pain on the right but said Gabapentin helped somewhat. (AR 467.)

On January 24, 2015, plaintiff saw Dr. Reburn for a follow up of his right heel fracture, reporting that he still had pain with increased standing or walking, particularly on

5

uneven surfaces. X-rays showed a healed fracture, but there was subchondral sclerosis and abnormality of the subtalar joint, and some collapse of the posterior facet since his previous x-ray. Dr. Redburn opined that plaintiff would likely need a subtalar joint fusion in the future. She prescribed a tri-lock ankle brace until he could be fitted with a custom brace. (AR 476-77.)

On March 30, 2015, plaintiff saw his primary care physician, Dr. Patrick Hedlund, for follow up. (AR 485-87.) Dr. Hedlund observed that plaintiff had partial right-sided weakness but was able to get around on his own. However, plaintiff's right rib pain persisted, and he could not raise his arm past about 30 degrees or touch the top of his head with his right hand.

On October 26, 2015, plaintiff saw Dr. Bedi for complaints of numbness and tingling in his right arm from his neck to his ring and pinky fingers, which was more intense than the general right-sided weakness he had been experiencing since his stroke. (AR 512.) Dr. Bedi referred plaintiff for both an EMG evaluation and an MRI of the cervical spine, suspecting that plaintiff might have either a cervical radiculopathy affecting the C8 nerve root or an ulnar mononeuropathy. Dr. Bedi also thought plaintiff might have rotator cuff arthropathy, for which he referred him to Dr. Patrick McDonough, a sports medicine specialist. (Id.)

Plaintiff saw Dr. McDonough on November 3, 2015. Dr. McDonough observed that plaintiff had pain when raising his right arm above shoulder height and that x-ray evidence was consistent with rotator cuff tendinopathy. He administered a steroid injection to plaintiff's right shoulder and advised him to follow up in 2-4 weeks as needed. (AR 515.)

On November 10, 2015, plaintiff returned to see Dr. Bedi to discuss his imaging studies. The MRI showed moderate cervical degenerative disc disease at several levels, but none at the C8 level, and the EMG was largely unremarkable, leaving Dr. Bedi without a clear explanation for plaintiff's radicular symptoms. (AR 516.) However, plaintiff said his symptoms seemed to be resolving, so Dr. Bedi recommended that plaintiff try an elbow brace to see if that provided further relief. (Id.)

### 2. 2016-2017

Plaintiff's medical treatment in early 2016 consisted mostly of medication re-checks and monitoring. On May 10, 2016, Dr. Redburn also administered a Kenalog injection for plaintiff's chronic pain in his right foot. (AR 522.)

On September 19, 2016, plaintiff saw Dr. Bedi again, reporting that his gait had worsened in the last few months. Dr. Bedi observed that plaintiff was shuffling his right leg much more than before and seemed to be carrying his arm in a more flexed position, which suggested to Dr. Bedi that plaintiff's spasticity had increased on the right. Dr. Bedi showed plaintiff some exercises he could perform and prescribed Flexeril, a muscle relaxer. (AR 527.)

At a follow up visit on November 9, 2016, plaintiff told Dr. Bedi that his gait, stiffness, and overall functioning had improved greatly since starting the medication. However, plaintiff reported that he had pain, mostly on the right, that traveled from his neck down towards his hands, particularly when he turned his head to the right. On examination, Dr. Bedi noted that plaintiff's spasticity had improved since the previous visit and his strength was about 4+ in his right upper extremity muscles, but turning his head

to the right reproduced his arm pain. Dr. Bedi ordered a repeat MRI and EMG, which showed changes from the prior studies in October 2015. This time, Dr. Bedi saw evidence suggesting a C7 radiculopathy. Dr. Bedi recommended that plaintiff meet with a spine surgeon to discuss future treatment options, including possible nerve root injections. (AR 533-35.)

On January 20, 2017, plaintiff also saw Dr. Hedlund for a plugged right ear. Dr. Hedlund observed that plaintiff was "a well-developed, well-nourished male in no acute distress" who had "evidence of a previous stroke, but gets along fairly well." (AR 540.) He also noted that plaintiff had right shoulder discomfort with chronic musculoskeletal pain around the shoulder and into the neck. Dr. Hedlund treated plaintiff's ear and refilled his pain medications.

### C. State Agency Consultants' Opinions

On February 5, 2015, six months after plaintiff's stroke, state agency consultant Mina Khorshidi, M.D., opined that within 12 months from his date of onset, plaintiff would be able to perform a full range of light work, meaning that he could stand or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, frequently lift 10 pounds, and occasionally lift 20 pounds. (AR 86.) Four months later, on June 4, 2015, Syd Foster, D.O., agreed that plaintiff could perform light work, but Foster thought plaintiff should be restricted to limited overhead reaching on the right and avoid even moderate exposure to vibration or hazards such as heights or machinery. (AR 96-97.)

### D. Hearing Testimony

At the March 29, 2017 hearing, plaintiff testified that he could not work because

of weakness on his right side. He could not lift his right arm above shoulder height, he had difficulty using his right hand, and his right foot sometimes gave out, causing him to fall. He also said he got dizzy a lot, could not remember things he just read, and was forgetful. In addition, he reported pain in his right rib and constant pain in his right ankle, which he rated as a 4 on a 10-point scale when he took his medication. Plaintiff said he could probably pick up 25 pounds but not consecutively, and he could not carry anything very far without risk of falling. Plaintiff said he did not have a driver's license and did not think he could drive because of the weakness in his right foot. Plaintiff testified that his treatment at that time consisted of regular blood draws, but that he was "up for a bunch of stuff coming up," including some type of treatment for his chronic pain. (AR 59-60.)

After plaintiff testified, the ALJ called a vocational expert, Richard Fisher, to testify. Answering a series of hypotheticals reflecting an individual of plaintiff's age, education, and work history, who had various work-related limitations, Fisher provided examples of available jobs that such an individual could perform. (AR 63-78.)

E. The ALJ's Decision

ALJ Kudlek issued her decision on June 28, 2017, finding that plaintiff had the severe impairments of a cerebrovascular accident, cardiomyopathy, rotator cuff tendinopathy, and degenerative disc disease of the cervical spine, but that none of these impairments were severe enough singly or in combination to meet or medically equal the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (*a.k.a.* "the Listings"). (AR 15-29.) Considering the limitations posed by these impairments, ALJ Kudlek further found that from August 3, 2014 through November 17, 2016, plaintiff had

the residual functional capacity ("RFC") to perform work at a sedentary exertional level *except* that he could: lift and carry 10 pounds occasionally and less than 10 pounds frequently; occasionally operate foot controls on the right; occasionally operate hand controls on the right; never reach overhead on the right; occasionally reach in all other directions on the right; occasionally handle, finger and feel with the right hand; and occasionally climb ramps and stairs, balance, stop, kneel, crouch and crawl. The ALJ also found that plaintiff was limited to: pushing and pulling 10 pounds on his right side; simple, routine, and repetitive tasks, but not at a production rate pace; simple, work-related decisions; few changes in a routine work setting defined as unskilled work; and learning by demonstration only. Based on Fisher's testimony that no jobs were available for a person like plaintiff who was so limited, the ALJ found that plaintiff was disabled for that closed period of time.

As support for this RFC assessment, the ALJ cited the objective medical findings, other medical evidence in the record, and "the consistent statements of the claimant in his application questionnaires and to his examining health care providers." (AR 21.) She also noted that, although the State agency medical consultants had opined that plaintiff could perform light work, those opinions were worthy of only "little weight" for the time period up to November 17, 2016, because "the consultants did not have the benefit of reviewing the full hearing level record including examination findings outlined above indicating very limited strength on the claimant's right side as well as the claimant's consistent and persuasive testimony." (AR 21.)

From November 18, 2016 and onward, however, ALJ Kudlek found that plaintiff had the same impairments she had found for the closed period, but he had experienced

10

"medical improvement" that resulted in an increase in plaintiff's RFC. Specifically, the ALJ observed that Dr. Bedi had conducted a neurological examination of plaintiff on this date, which showed that: (1) plaintiff had an improved level of spasticity in the right hemibody and bilateral lower extremities; and (2) plaintiff's strength was about 4+ in all his right upper extremity muscles. (AR 24.) As a result of this improvement, the ALJ found that starting on November 18, 2016, while his other limitations remained the same, plaintiff could:

- Perform *light* work (meaning that he could lift no more than 20 pounds but could frequently lift or carry objects weighing up to 10 pounds);

- *Frequently* operate hand controls on the right;

- *Occasionally* reach overhead on the right;

- *Frequently* reach in all other directions on the right; and

- *Frequently* handle, finger and feel with the right hand.

As support for this increased RFC, the ALJ relied on the same State agency medical consultants' opinions she had previously rejected, finding them entitled to "substantial" or "moderate" weight for the period November 18, 2016, onward because they were "generally consistent with the overall evidence including examination findings that indicated the claimant had returned to almost full strength on his right side," as well as his hearing testimony that he could probably lift 25 pounds. (AR 26.) Finally, relying again on V.E. Fisher's testimony, the ALJ found that beginning on November 18, 2016, plaintiff was *not* disabled because there were jobs exiting in significant numbers in the national economy that he could perform despite his limitations.

11

OPINION

On judicial review, the court must accept the Commissioner's factual findings as conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005). Accordingly, where conflicting evidence allows reasonable minds to reach different conclusions about a claimant's disability, the responsibility for the decision falls on the Commissioner. *Edwards v. Sullivan*, 985 F.2d 334, 336 (7th Cir. 1993). At the same time, the court must conduct a "critical review of the evidence," *id.*, and insure the ALJ has provided "a logical bridge" between findings of fact and conclusions of law, *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018).

Pursuant to SSA regulations, after a disability determination, the agency must conduct a continuing disability review periodically to evaluate the claimants impairments and "determine if [the claimant is] still eligible for disability . . . benefits." 20 C.F.R. §§ 404.1589; 416.989. The Commissioner uses an eight-step sequential process to determine whether an individual's disability continues. 20 C.F.R. §§ 404.1594; 416.984. As part of this process, the agency must determine whether "there has been any medical improvement in [the claimant's] impairment(s) and, if so, whether this medical improvement is related to [the claimant's] ability to work." 20 C.F.R. §§ 404.1594(a); 416.994(a). "Medical

improvement," is defined as "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled." 20 C.F.R. §§ 404.1594(b)(1); 416.994(b)(1). A finding of medical improvement "must be based on improvement in the symptoms, signs, and/or laboratory findings associated with [the claimant's] impairment(s)." *Id*. If the ALJ finds medical improvement, then she must also consider whether that improvement is related to the claimant's ability to do work. *Id*. Finally, even if the agency determines that the claimant has experienced medical improvement related to the claimant's ability to work, the agency "must also show that [the claimant is] currently able to engage in substantial gainful activity before [the agency] can find that [the claimant is] no longer disabled." *Id*.

For the reasons that follow, neither the record nor the ALJ's decision supports her finding of medical improvement related to plaintiff's ability to work.

As best as the court can tell, in finding that plaintiff had a medical improvement related to his capacity for work, the ALJ relied almost exclusively, if not entirely, on Dr. Bedi's neurological examination findings from November 18, 2016, which showed only that the plaintiff had an improved level of spasticity on the right, returned to almost full strength in his upper extremity muscles, and reported the Flexeril prescription had improved his gait and stiffness to a very large extent.

There are a number of flaws in the ALJ's reasoning. *First*, the ALJ overlooked the fact that plaintiff's improvement on November 18, 2016, followed an *exacerbation* of his condition on September 19, 2016, when plaintiff presented to Dr. Bedi with a shuffling gait and stiff right arm more pronounced than during his previous visit. Thus, when Dr.

13

Bedi observed that plaintiff's gait and stiffness had improved to a large extent on Flexeril, it is not clear that he was reporting a new level of functioning, as opposed to a return to the baseline functioning plaintiff had before the spasticity set in. As for plaintiff's upper extremity strength, it had generally been at 4/5 starting as early as November 2014, so again, how much plaintiff actually "improved" from his previous condition is unclear at best. In other words, although it is clear that plaintiff's condition on November 18, 2016 was an improvement over his condition two months before, it is *not* clear how much that reflected an overall improvement in his work capacity.

*Second*, the ALJ never explained *how* Dr. Bedi's findings translated into an increase in plaintiff's RFC, nor is her logic apparent from the record, much less her decision. Presumably, the ALJ equated the increase in plaintiff's upper extremity strength with an increased capacity for use of his right arm and hand for handling, fingering, and reaching, including overhead work. However, the ALJ wholly fails to account for the line of evidence showing that plaintiff had persistent shoulder and right rib pain, accompanied by limited range of motion, even as the right-sided weakness from his stroke otherwise improved. For example, plaintiff's occupational therapist remarked on November 3, 2014, that plaintiff's right neck and shoulder symptoms appeared to be at maximal medical improvement; Dr. Hedlund noted in March 2015 that plaintiff could not raise his arm past about 30 degrees; and plaintiff testified at the hearing that he could not raise his right arm above his shoulder, at least without using his left hand and arm to lift the right. *Nothing* in Dr. Bedi's neurological evaluation of November 18, 2016, suggests that any of this had changed with the Flexeril.

*Third*, the ALJ overlooked evidence that suggests a *worsening* of plaintiff's condition in November 2016. Specifically, at the same time he reported that his gait and stiffness had improved on the Flexeril, plaintiff told Dr. Bedi that he was having right arm pain, and later EMG and MRI studies indicated a C7 radiculopathy that Dr. Bedi found suggested nerve root injections and a surgical consult. Nevertheless, the ALJ failed to even mention these studies, relying instead on earlier studies from November 2015 that did not show any radiculopathy. (AR 25 (noting "no electrodiagnostic evidence of . . . cervical motor radiculopathy on the right.").) Moreover, contrary to the ALJ's suggestion, plaintiff did not tell Dr. Bedi in November 2016 that his neck and arm pain was resolved by the Flexeril; rather, plaintiff said he had pain *despite use of* the Flexeril. (AR 533 ("Mr. Dombrock presents today with improvement in spasticity, but pain in the right C7 nerve root territory in the last few weeks.").) At minimum, the ALJ erred by failing to discuss this evidence, which suggested a new impairment and potentially greater functional limitations than the ALJ found. *See Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (although ALJ need not discuss every piece of evidence in the record, ALJ may not ignore an entire line of evidence that is contrary to her ruling) (citations omitted).

*Fourth*, the ALJ erred by relying upon the opinions of the state agency medical consultants as evidence for her post-November 18, 2016, RFC assessment. (AR 26.) Those opinions were filed in February and June of 2015, well over a year before plaintiff's supposed medical improvement on November 18, 2016, yet the ALJ ascribed "moderate" and "significant" weight, respectively, without explaining how those opinions could possibly be relevant. Indeed, neither of the agency physicians providing those opinions had even seen the records on which the ALJ based her own finding of medical improvement,

much less the new evidence of C7 radiculopathy. *See Goins v. Colvin*, 76 F.3d. 677, 680 (7th Cir. 2014) (ALJ erred by relying on opinions of consulting physicians who had not seen recent MRI that appeared to show worsening of plaintiff's condition). What is more, in finding plaintiff disabled for the closed period from August 4, 2014 to November 17, 2016, the ALJ *discounted* those very same opinions because "the consultants did not have the benefit of reviewing the full hearing level record, including examination findings … indicating very limited strength on the claimant's right side as well as the claimant's consistent and persuasive testimony." (AR 21.) If the state agency opinions were not reliable for the time period up to November 17, 2016, then they were almost certainly unreliable for the time period starting on November 18, 2016. Regardless, by relying on the opinions for the latter period and not the former, the ALJ failed to explain her reasoning in the face of apparently flawed logic.

When an ALJ denies benefits, she must build an "accurate and logical bridge from the evidence to her conclusion," *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000), and she is not allowed to "play doctor" by using her own lay opinions to fill evidentiary gaps in the record, *see Blakes v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003). Given that the agency consultants on whom she now inexplicably relies actually rendered their opinions before the date on which the ALJ found medical improvement, and further that neither consultant saw the new MRI and EMG evidence indicating C7 radiculopathy, the ALJ could only have been making her own medical assessment of the treatment records to conclude that they showed improvement. This is by itself reversible error. *See Brown v. Saul*, No. 19-1363, --- Fed. Appx. ---, 2020 WL 119589, at *3 (7th Cir. Jan. 10, 2020) (substantial evidence did not support ALJ's finding that plaintiff's tremors had improved in July 2015 where ALJ

16

drew his own conclusions about a doctor's note from June 2016 noting tremors; without medical input, ALJ could not reasonably infer that doctor's treatment notes reflected reemergence rather than continuation of tremors); *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016) (ALJ erred by relying on medical opinion that fails to account for new and potentially decisive medical evidence). In particular, because the ALJ's determination that plaintiff experienced medical improvement related to his capacity for work is not supported by substantial evidence, that determination cannot stand. 42 U.S.C. § 405(g); *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Because the ALJ's finding that plaintiff experienced medical improvement related to his ability to work was flawed, it is unnecessary to address his related arguments regarding (1) the ALJ's assessment of plaintiff's subjective complaints and (2) the opinions of Travis Hinze, Ph.D., and vocational consultant Jeb Kaiser. On remand, the ALJ should give fresh consideration to the evidence of *all* of plaintiff's medical conditions as they relate to his claim that he remained disabled after November 18, 2016.[2]

---

[2] This includes plaintiff's right ankle impairment, which appears to have been largely overlooked by the ALJ in her assessment. Although it is true, as the ALJ found, that plaintiff's heel fracture healed completely within 12 months, plaintiff now has the secondary impairments of sinus tarsi syndrome and subtalar joint osteoarthritis, with resulting ankle pain and instability, which raises the question whether plaintiff could perform the walking and standing requirements of light work. The court expresses no opinion on the extent of this right ankle impairment, except that the evidence in the record suggests it deserves more attention than the ALJ gave it.

ORDER

IT IS ORDERED that the decision of the Commissioner finding plaintiff David Dombrock not entitled to disability insurance benefits or supplemental security income from November 18, 2016 forward is REVERSED AND REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

Entered this 31st day of January, 2020.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge